IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Crystal Suzanne Whitfield, | ) | C/A No.: 1:14-3352-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On February 7, 2011, Plaintiff filed an application for DIB in which she alleged her disability began on June 16, 2009. Tr. at 91, 106–07. Her application was denied initially and upon reconsideration. Tr. at 92–94, 99–100. On January 3, 2013, Plaintiff

had a hearing before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 27–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 21, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 20, 2014. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 40 years old at the time of the hearing. Tr. at 30. She obtained bachelor's and master's degrees. Tr. at 31. Her past relevant work ("PRW") was as a purchaser and a human resource manager and professional. Tr. at 49. She alleges she has been unable to work since June 16, 2009. Tr. at 106.

          2.     Medical History

              a.     Evidence Before ALJ

On June 16, 2009, Plaintiff underwent cervical lymphadenopathy and biopsy of a right posterior cervical lymph node. Tr. at 257–59.

Plaintiff consulted with Szabolcs Batizy, M.D. ("Dr. Batizy"), for Hodgkin's lymphoma on June 19, 2009. Tr. at 254–56. He assessed lymphocyte-rich Hodgkin's disease. Tr. at 255. He indicated the course of treatment would be to proceed with a staging workup consisting of a PET scan, CTs, laboratory tests, bone marrow aspiration, and biopsy. Tr. at 256.

On July 1, 2009, Plaintiff underwent placement of a left subclavian vein Port-A-Cath. Tr. at 260–61.

When Plaintiff followed up on July 15, 2009, Dr. Batizy indicated the work-up revealed stage II-B disease. Tr. at 263. Dr. Batizy wrote that Plaintiff tolerated her first cycle of ABVD chemotherapy well. *Id.* Plaintiff complained of some transient bone pain, and Dr. Batizy indicated it was related to Neupogen injections. *Id.* Dr. Batizy noted prominent adenopathy in Plaintiff's neck and prominence of her right tonsillar region. *Id.* He scheduled Plaintiff for the next two cycles of ABVD, encouraged her to stop smoking, and prescribed Bactrim to be taken over the weekend. *Id.*

On July 29, 2009, Plaintiff reported to Dr. Batizy that her night sweats had decreased and that she was tolerating ABVD chemotherapy well. Tr. at 264. Dr. Batizy noted that Plaintiff had stopped smoking. *Id.* Plaintiff complained of some tenderness around her Port-A-Cath, but noted that tenderness in her neck had improved. *Id.* Dr. Batizy observed a minimal degree of edema around the Port-A-Cath. *Id.* He indicated Plaintiff should continue ABVD; obtain a neck CT, chest x-ray, and pulmonary function tests to monitor for Bleomycin pulmonary toxicity; and continue taking Bactrim on Saturdays and Sundays to prevent pneumocystis pneumonia. Tr. at 264–65.

Plaintiff followed up with Dr. Batizy on August 19, 2009, and indicated her fevers and night sweats had resolved. Tr. at 266. She indicated she had presented to the emergency room on August 7, when she developed a low-grade fever and swelling in her chest wall, neck, and left arm. *Id.* Dr. Batizy noted no abnormalities on examination and indicated Plaintiff should continue with chemotherapy as scheduled. Tr. at 266–67.

On September 16, 2009, Plaintiff indicated to Dr. Batizy that she had tolerated chemotherapy with minimal nausea, but developed slight hyperpigmentation related to Bleomycin. Tr. at 268. Dr. Batizy observed no abnormalities, indicated Plaintiff's Hodgkin's disease appeared to be in remission, and ordered Plaintiff to continue with ABVD chemotherapy. Tr. at 268–69.

Plaintiff followed up with Dr. Batizy on October 14, 2012, and reported recent fever, chills, and discomfort in her Port-A-Cath area. Tr. at 270. Dr. Batizy ordered multiple tests and instructed Plaintiff to follow up with T. Steven McElveen, M.D. ("Dr. McElveen"). *Id.* He indicated that Plaintiff appeared to be in remission clinically and that he had not yet decided whether she should undergo radiation treatment. Tr. at 271.

On November 18, 2009, Dr. Batizy indicated Plaintiff developed bilateral pulmonary infiltrates and had reduced diffusing capacity in her lungs. Tr. at 272. Plaintiff described some mild dyspnea on exertion. *Id.* Dr. Batizy ordered chemotherapy to be put on hold and Plaintiff to undergo a gallium scan. *Id.*

On November 25, 2009, Dr. Batizy indicated the gallium scan revealed some interstitial changes in her lung. Tr. at 274. He ordered Plaintiff's chemotherapy to remain on hold until the source of the problem could be determined. *Id.*

Plaintiff presented to Charles A. Thompson, M.D. ("Dr. Thompson"), on December 1, 2009. Tr. at 251. Dr. Thompson assessed abnormal chest x-ray or CT and ordered bronchoscopy with biopsy. Tr. at 253.

Plaintiff followed up with Dr. Batizy on December 2, 2009. Tr. at 277–78. He indicated that the bronchoscopy suggested some inflammatory changes, but no evidence

of lymphoma. Tr. at 277. He stated it was unclear if Plaintiff had resolving pneumonia or a Bleomycin effect, but that her condition was improving. *Id.* Dr. Batizy discontinued use of Bleomycin and ordered that Plaintiff finish chemotherapy. *Id.* He also indicated Plaintiff should undergo a PET scan in two weeks. *Id.*

On December 16, 2009, Dr. Batizy observed Plaintiff's dyspnea to be markedly improved. Tr. at 279. He assessed Hodgkin's disease as being in remission. Tr. at 280.

On January 27, 2010, Dr. Batizy indicated Plaintiff had completed chemotherapy and that her dyspnea and respiratory status were improved. Tr. at 281.

On April 12, 2010, Plaintiff followed up with Dr. Batizy for re-evaluation of Hodgkin's disease. Tr. at 232. Dr. Batizy indicated Plaintiff appeared to be in remission and that her pulmonary function tests indicated stability and some degree of improvement. *Id.* He noted that Plaintiff was asymptomatic and able to go up and down stairs without a problem. *Id.* He assessed resolving pulmonary toxicity and Hodgkin's disease in remission and instructed Plaintiff to follow up in three months. Tr. at 232–33.

Spirometry testing on April 19, 2010, revealed Plaintiff to have a minimal obstructive lung defect and a moderate decrease in diffusing capacity. Tr. at 230. A chest x-ray indicated no abnormalities. Tr. at 231.

Plaintiff followed up with Dr. Batizy on August 4, 2010, and reported experiencing exhaustion and fatigue at work. Tr. at 215. Dr. Batizy observed Plaintiff to be anxious and upset and recommended she consult a counselor. *Id.* He indicated there was no evidence of recurrence of Hodgkin's disease. *Id.*

On October 16, 2010, Plaintiff presented to Charles K. Edsall, M.D. ("Dr. Edsall"), with complaints of shortness of breath and a non-productive cough. Tr. at 238. Dr. Edsall diagnosed and prescribed medications to treat an upper respiratory infection. *Id.*

On December 22, 2010, Dr. Batizy indicated Plaintiff was "extremely frantic and worried about a generalized pruritis and rash." Tr. at 285. He noted Plaintiff had partial improvement of symptoms with use of Prednisone and observed a fading rash on Plaintiff's chest, torso, and back. *Id.* He indicated that it was unclear if the rash was related to Hodgkin's disease, but he referred Plaintiff to a dermatologist and for a CT scan. *Id.*

On February 4, 2011, Dr. McElveen indicated that Plaintiff had no clinical symptoms consistent with thrombosis and that a venous duplex of the jugular vein was negative for deep venous thrombosis. Tr. at 244. He indicated the radiologist likely overread the CT scan and that no further follow up was needed. *Id.*

Plaintiff followed up with Dr. Batizy on February 9, 2011, who indicated the adenopathy in Plaintiff's neck region was likely reactive in nature and had resolved. Tr. at 286. He indicated there was no evidence of recurrence of Hodgkin's disease and that Plaintiff remained in remission. *Id.*

On April 14, 2011, Rebecca W. Norris, M.D. ("Dr. Norris"), indicated Plaintiff's mental diagnoses included depression and anxiety. Tr. at 287. She noted Plaintiff was prescribed Citalopram, Buspar, and Alprazolam to treat her mental conditions. *Id.* She indicated Plaintiff was oriented to time, person, place, and situation; had intact thought

processes; had appropriate thought content; had normal mood/affect; and had adequate attention/concentration and memory. *Id.* She described Plaintiff's work-related limitation in function as slight and indicated that psychiatric care had not been recommended. *Id.* An undated form contained similar impressions, but Dr. Norris instead described Plaintiff's mood/affect as worried/anxious. Tr. at 307.

Plaintiff presented to Dr. Norris on May 2, 2011, with a fever and possible urinary tract infection ("UTI"). Tr. at 314. Plaintiff reported one episode of incontinence. *Id.* Dr. Norris indicated Plaintiff did not have a UTI and suggested she increase her liquids and take Pyridium. *Id.*

Plaintiff followed up with Dr. Batizy on May 25, 2011. Tr. at 290. She complained of back discomfort, occasional hip discomfort, and hurting all over. *Id.* She also endorsed intermittent constipation and diarrhea. *Id.* Plaintiff expressed to Dr. Batizy that she believed her gastrointestinal symptoms were related to chemotherapy, but Dr. Batizy indicated that it had been over a year since Plaintiff had undergone chemotherapy and that the gastrointestinal complaints could not be related. *Id.* Dr. Batizy indicated Plaintiff was "a little anxious," but in no acute distress. *Id.* He suggested she likely had a component of irritable bowel syndrome and arthritic complaints related to poor physical condition and weight gain. *Id.* He indicated there was no evidence of a recurrence of Hodgkin's disease and suggested Plaintiff resume oncology rehab and obtain a bone scan. *Id.*

A bone scan on May 31, 2011, indicated minimally increased activity in the L1-2 intervertebral disc region that appeared to correspond with an area of moderate degenerative disc disease/spondylosis. Tr. at 302.

Plaintiff presented to Dr. Norris on June 17, 2011, to discuss arthritis and a rash on her face. Tr. at 310. Plaintiff complained that she hurt all over, but Dr. Norris noted no significant findings. *Id.*

Plaintiff visited Robin L. Moody Ph. D. ("Dr. Moody"), for an evaluation on July 1, 2011. Tr. at 317–19. She endorsed symptoms of depression, including depressed mood, fatigue, weight gain, insomnia, withdrawal, and difficulty concentrating. Tr. at 317. She endorsed symptoms of generalized anxiety disorder, including excessive anxiety and worry on most days over the prior six-month period, difficulty controlling worry, restlessness, feeling keyed up, being easily fatigued, having difficulty concentrating, experiencing a blank mind, being irritable, having muscle tension, and experiencing disturbed sleep. *Id.* Dr. Moody indicated Plaintiff was casually dressed and groomed; appeared oriented; did not display any unusual mannerisms; and was able to answer all questions. Tr. at 318. She described Plaintiff's affect as being "very depressed" and her mood as "sad." *Id.* Dr. Moody noted Plaintiff's memory was intact, but her concentration was poor. *Id.* Plaintiff scored 29 of a possible 30 points on the Mini Mental State Examination. *Id.* She had difficulty with delayed recall and missed four items in serial sevens and threes. *Id.* Dr. Moody related the following clinical functional observations:

> Ms. Whitfield can complete chores and prepare meals. She can drive a car and shop. She attends therapy weekly. She has close relationships with her family and friends. She relies on her friends for help. She leaves the house

> several times a week to attend therapy and doctor's appointments. Her
> concentration is rather impaired today. Her pace and persistence are
> adequate. She can carry out simple instructions. She can manage her own
> funds. She did not exaggerate symptoms. Ms. Whitfield became very
> emotional during the evaluation and broke down and cried. . . . She appears
> more depressed than she admits and is very anxious.

*Id.* Dr. Moody diagnosed recurrent and moderate major depressive disorder, generalized

anxiety disorder, and a history of physical abuse. Tr. at 319. She assessed a global

assessment of functioning ("GAF") score of 53.[1] *Id.*

Plaintiff visited Stuart Barnes, M.D. ("Dr. Barnes"), for a comprehensive medical

examination on July 5, 2011. Tr. at 322–25. Plaintiff endorsed shortness of breath when

showering and dressing. Tr. at 322. She stated she was easily fatigued. *Id.* She endorsed

episodes of heartburn and diarrhea. Tr. at 323. Dr. Barnes observed Plaintiff to be

depressed and anxious and to cry several times during the examination. *Id.* Plaintiff

indicated she was often forgetful and stated that her forgetfulness had begun after she

received chemotherapy. *Id.* Dr. Barnes indicated Plaintiff walked with a straight cane, but

---

[1] The GAF scale is used to track clinical progress of individuals with respect to
psychological, social, and occupational functioning. American Psychiatric Association:
*Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision.
Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF
scale provides 10-point ranges of assessment based on symptom severity and level of
functioning. *Id.* If an individual's symptom severity and level of functioning are
discordant, the GAF score reflects the worse of the two. *Id.* A GAF score of 41–50
indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational or school functioning
(e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51–60 indicates "moderate
symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate
difficulty in social or occupational functioning (e.g., no friends, unable to keep a job)."
*Id.* A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and
mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally functioning pretty well,
[and] has some meaningful interpersonal relationships." *Id.*

had a normal gait and did not seem to depend on the cane. *Id.* He observed Plaintiff to have normal range of motion ("ROM") of her bilateral shoulders, elbows, and wrists. Tr. at 324. He found her to have mild crepitus in her left shoulder. *Id.* He noted no skin abnormalities. *Id.* Plaintiff had normal ROM in all digits of her hands. *Id.* She had 4/5 strength in the major muscle groups of her bilateral upper extremities, but Dr. Barnes noted that her effort "may be slightly inconsistent." *Id.* She had normal ROM in her bilateral hips, knees, and ankles. *Id.* She had 4/5 hips flexor and extensor strength, but Dr. Barnes again noted that he questioned the consistency of her effort. *Id.* Plaintiff was able to perform a full squat, but had difficulty standing up. *Id.* She had mild to moderate crepitus in her left knee. *Id.* Plaintiff's cervical ROM was normal, but she had decreased lumbar ROM. *Id.* Dr. Barnes noted no neurologic deficits. *Id.* He assessed Hodgkin's disease in remission, diffuse arthralgia, chronic back pain, chronic dyspnea, and depression. *Id.*

On July 12, 2011, state agency consultant Craig Horn, Ph. D. ("Dr. Horn"), completed a psychiatric review technique form ("PRTF"), in which he considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 327. He assessed Plaintiff as having mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 337. Dr. Horn found Plaintiff to have moderate limitations with regard to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; and to maintain attention and

concentration for extended periods. Tr. at 341. He indicated Plaintiff had the following abilities:

> She is able to remember location and work-like procedures. She is able to understand and remember short and simple instructions.

> She is able to carry out very short and simple instructions, but could not carry out detailed instructions. She is able to understand normal work-hour requirements and be prompt within reasonable limits. She retains the ability to make simple work-related decisions.

> She has the capacity to ask simple questions and request assistance from peers or supervisors. She is capable of interacting appropriately with the public.

> She would respond appropriately to changes in a routine setting. She has the ability to be aware of personal safety and avoid work hazards. She retains the capacity to travel to and from work using available transportation.

Tr. at 343.

State agency medical consultant Seham El-Ibiary ("Dr. El-Ibiary"), M.D., completed a physical residual functional capacity ("RFC") assessment on August 9, 2011. Tr. at 345–52. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid concentrated exposure to hazards. *Id.*

CT scans of Plaintiff's neck and chest on August 17, 2011, were unremarkable. Tr. at 361–63.

Plaintiff followed up with Dr. Batizy on August 24, 2011, with a complaint of vague lumps in her left breast. Tr. at 356. Dr. Batizy indicated they were likely cystic in nature, but referred Plaintiff for a mammogram. *Id.* On September 13, 2011, the mammogram revealed the presence of a small, benign lymph node on the left. Tr. at 354.

On October 24, 2011, Plaintiff reported to Dr. Norris that she was in a lot of pain and that her arthritis was getting worse. Tr. at 371. She also indicated her pain was worsening her depression and causing more mood issues. *Id.* Plaintiff reported fatigue. Tr. at 372. Dr. Norris added prescriptions for Cymbalta and Mobic and discontinued Naproxen. *Id.*

Plaintiff followed up with Dr. Norris on November 14, 2011. Tr. at 369. She reported continued stomach problems since undergoing chemotherapy, but indicated the problems were no worse since starting Cymbalta. *Id.* Dr. Norris indicated Plaintiff should stop Buspar because of sleep issues, but should remain on Cymbalta and Melatonin. Tr. at 370. She prescribed Klonopin and continued Plaintiff's prescription for Mobic. *Id.*

On January 12, 2012, state agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), completed a physical RFC assessment. Tr. at 373–80. He indicated Plaintiff was limited as a follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.*

Plaintiff underwent a diagnostic evaluation with licensed clinical psychologist C. David Tollison, Ph. D. ("Dr. Tollison"), on March 6, 2012. Tr. at 382–86. She described a loss of interest in people and activities and complained of memory and concentration deficits. Tr. at 383. She reported three to five panic attacks per week. *Id.* Plaintiff described constant worry about her health, feelings of uncertainty, and sleep disturbance. *Id.* She wept throughout the evaluation, and Dr. Tollison described her as having "marginal control over her emotions." *Id.* Plaintiff endorsed chronic fatigue and a 15-pound weight gain due to inactivity. *Id.* She reported that she visited her parents once or twice a week, but spent most of her time at home and in bed. Tr. at 384. Dr. Tollison observed Plaintiff to be "in a near panic during the early parts of the evaluation" and to be "hyper-verbal and rambling in her conversation." *Id.* He indicated Plaintiff's thought processes were a bit scattered and speeding, but were basically intact and logical. *Id.* He found Plaintiff's memory for recent and remote events to be grossly intact. *Id.* He described Plaintiff's affect as blunted and her mood as anxious. Dr. Tollison administered the Pain Patient Profile ("P-3") psychological test and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and found results of both tests to be valid. Tr. at 384–85. Results of the P-3 test revealed Plaintiff to have depression in the top fifth percentile, anxiety in the top seventh percentile, and somatization in the top fifth percentile. Tr. at 384. MMPI testing indicated Plaintiff to be anxious, highly reactive, clinically depressed, and to complain of far more than the usual number of chronic physical complaints, pain problems, and health-related issues. Tr. at 385. Dr. Tollison

diagnosed major depressive disorder and panic disorder without agoraphobia. *Id.* He

assessed a GAF score of 45–50. Tr. at 386. He indicated the following:

> Based upon my evaluation of the patient, review of medical records, and results of psychological testing, it is my opinion Ms. Whitfield does not exhibit the concentration, persistence, or pace typically required in a work setting. Due to distraction and functional limitations, she is expected to have problems learning, remembering, and carrying out instructions repetitively. Concentration is impaired due to the distracting nature of her pain and agitated depression. Due to chronic fatigue, noted throughout the medical record and subsequent to chemotherapy, she is expected to require frequent and unscheduled rest periods. Due to cognitive agitation and distress, she is expected to have problems responding appropriately to changes in the workplace. Due to the combination of her co-morbid symptoms, she is expected to have difficulty coping with routine work pressures, stresses, and demand situations. Her condition is chronic and expected to continue over the next twelve or more months. If awarded funds, Ms. Whitfield is capable of managing funds.

*Id.*

On May 16, 2012, Thomas Yared, M.D., reviewed Dr. Tollison's report, but found

the conclusions were not supported by his objective findings. Tr. at 399.

On December 17, 2012, Dr. Norris wrote a letter explaining that she treated

Plaintiff for Hodgkin's lymphoma, pulmonary fibrosis, and polymyalgia. Tr. at 400. She

indicated Plaintiff could not sit or stand for greater than one hour at a time, must take

breaks as needed, was unable to perform repetitive fine motor activity, and had limited

memory and ability to stay on task. *Id.* Dr. Norris stated she did not think Plaintiff was

capable of returning to work based on her limitations. *Id.*

b.     Evidence Submitted to Appeals Council

On April 18, 2013, Plaintiff was examined by forensic psychiatrist Dennis C.

Chipman, M.D. ("Dr. Chipman"). Tr. at 6–8. Plaintiff complained of pain, fatigue, and

depression. Tr. at 7. She correctly provided the date, but had some difficulty interpreting a proverb. *Id.* She was able to adequately identify similarities, but had some trouble with serial sevens. *Id.* She remembered the last five Presidents of the United States, but was unable to identify three unrelated items after a five-minute delay. *Id.* Plaintiff's affect was labile and her self-described mood was "defeated and just happening." *Id.* She denied hearing voices, having psychotic symptoms or experiencing hallucinations, but she endorsed having nightmares and crying spells. *Id.* Dr. Chipman indicated "[s]he related in a bouncy, somewhat engaged manner seeming to be interested [in] all sorts of different things that temporarily attracted her attention." *Id.* He diagnosed bipolar disorder, most recent episode, hypo manic; generalized anxiety disorder; and personality disorder. Tr. at 8. He assessed a GAF score of 46 with a highest past GAF score of 50. *Id.* He further indicated the following:

> I am in agreement with other examiners who have seen the patient as depressed, but I see the problem primarily as a bipolar type of depression in which we see flight of mood, generalized anxiety and difficulty with relating to people. She simply cannot concentrate on task at hand and jumps from one thing to another. This would then make work throughout the workday virtually impossible. She would have difficulty getting on with co-workers even though she would try and she also would have a great deal [of] difficulty with the workday without frequent absenteeism. This all adds up to a considerable amount of ongoing occupational disability.
>
> The condition is chronic and can be expected to last 12 months or more. The condition appears rather chronic to this examiner. Should funds be awarded on her behalf, she would be able to manage those funds.

*Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on January 3, 2013, Plaintiff testified she had a bachelor's degree in behavioral science and business and a master's degree in human resource development. Tr. at 31. She indicated she lived alone in a house, but that her mother stayed with her on at least one night each week. *Id.* She stated she had a driver's license, but limited her driving due to dizziness caused by medications. *Id.*

Plaintiff testified her PRW included a job as a buyer for Robert Bosch. Tr. at 34–35. She indicated she worked at Calvary Home for Children as director of accounts payable, human resources, and general administration. Tr. at 35–36. She stated she worked for about eight months as a server in a pub after being laid off from Calvary Home in 2006. Tr. at 36. She indicated she then took a job as a store human resources manager for Home Depot, but that her position was eliminated in April 2008. *Id.* She testified she next worked as director of human resources for the Goodwill stores in coastal South Carolina. Tr. at 37–38.

Plaintiff testified she was sick during the time she worked for Goodwill and that her doctors were unable to diagnose her condition. Tr. at 38. She indicated she had performance issues in her job and decided to move back to Anderson, where she had a home and family. Tr. at 39. She stated she developed a knot on May 3, 2009, and was diagnosed with Hodgkin's lymphoma on June 19. Tr. at 39. She indicated she was completely incontinent and lost her hair during chemotherapy. Tr. at 40. Plaintiff testified

16

that she had to stop chemotherapy at one point because of a lung disorder. *Id.* She indicated she saw Dr. Thompson, who told her that the lung condition was permanent and that she should apply for disability. *Id.*

Plaintiff testified she waited tables at a pub during weeks when she was not undergoing chemotherapy, but eventually transitioned to a job as a hostess because waiting tables was too difficult. Tr. at 33. She stated that, after completing chemotherapy, she transitioned back to waiting tables, but discovered she was not able to do the job because of pain. Tr. at 33–34. She testified it became more difficult for her to stand and walk and she returned to the hostess position. Tr. at 34. She indicated her pain was so severe that she could not perform the hostess job and was released from employment in May 2011. *Id.* Plaintiff stated she worked at the pub for 20 or fewer hours per week. *Id.*

Plaintiff testified her depression and pain increased. Tr. at 41. She described her pain as starting in her lower back and radiating down her legs and into her feet. *Id.* She stated she experienced extreme pain the backs of her thighs and in her shins, calves, and feet. *Id.* She indicated she had difficulty gripping and holding objects and sitting and standing for long periods. *Id.* She testified she dropped things frequently. *Id.* She stated her pain medications caused her to go to the bathroom constantly and to be tired. Tr. at 41. She indicated her pain caused anxiety and that she had problems with concentration. *Id.* She stated she experienced migraine headaches that were accompanied by nausea and were not alleviated by medication. Tr. at 42–43.

Plaintiff indicated she could walk for 30 minutes at a time and could stand in one spot for five to ten minutes at a time. Tr. at 44–45. She stated she could sit for about 30

minutes with her feet on the ground and an hour if her feet were propped. Tr. at 45. She testified she could lift nothing heavier than her 15-pound dog. Tr. at 46. She stated it was difficult for her to bend to get items from the washer, dryer, and dishwasher and to put things way. *Id.*

Plaintiff indicated she frequently had difficulty getting out of bed in the morning either because of depression or pain. Tr. at 43. She stated she would lie down several times daily, particularly after eating. *Id.* She testified she often soaked in a bath with hot water and Epsom salt, which helped her to be able to move. Tr. at 43–44. She indicated she prepared light meals and performed light housework. Tr. at 44. She stated she sometimes walked her dog up and down her street. *Id.* Plaintiff stated that her mother helped her with larger chores like changing her sheets and washing and putting away her laundry. Tr. at 32. She also indicated her mother visited the grocery store with her because she was unable to carry the bags on her own. *Id.*

Plaintiff testified that she had been treated by Dr. Norris since February 2009. Tr. at 47. She indicated that she provided truthful responses during her visit with Dr. Tollison. Tr. at 48.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Carl Weldon reviewed the record and testified at the hearing. Tr. at 49–51. The VE categorized Plaintiff's PRW as a buyer/purchaser, which was light in exertional level with a specific vocational preparation ("SVP") of 7; a human resource manager/director, which was light in exertional level with an SVP of 8; and a human resource professional, which was heavy in exertional level with an SVP of 8. Tr.

at 49. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work that involved no more than simple, repetitive tasks and instructions. *Id.* The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ then described a hypothetical individual of Plaintiff's vocational profile who was limited to light work, meaning lifting no more than 20 pounds occasionally and 10 pounds frequently and sitting, standing, and walking up to six hours each in an eight-hour day; could frequently climb stairs; could occasionally climb ladders, kneel, stoop, crouch, and crawl; should avoid concentrated exposure to fumes; and was limited to simple, repetitive tasks and instructions. Tr. at 50. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as a cashier, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-010, with 1,400 positions in the upstate of South Carolina and 354,000 positions nationally and a fast food worker, *DOT* number 311.472-010, with 3,200 positions in upstate South Carolina and 1,800,000 jobs nationally. Tr. at 50–51. The ALJ asked if these or any jobs would be available if the individual were unable to consistently work eight hours a day, five days a week or would miss three or more days of work per month. Tr. at 51. The VE testified that such limitations would preclude any kind of work activity on a consistent basis. *Id.* The ALJ next asked if the jobs identified or any jobs would be available if the individual could not consistently maintain attention and focus for as much as two hours at a time. *Id.* The VE testified that no jobs would be available because, even at the unskilled level, an individual would be expected to focus and concentrate for two hours at a time. *Id.*

19

2.     The ALJ's Findings

In her decision dated February 21, 2013, the ALJ made the following findings of

fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.
2.     The claimant has not engaged in substantial gainful activity since June 16, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.     The claimant has the following severe impairments: status post Hodgkin's Disease with resolving pulmonary toxicity; degenerative joint disease of the left knee; lumbar degenerative disc disease; depression; and anxiety (20 CFR 404.1520(c)).
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is limited to frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds, and occasional balancing, kneeling, stooping, crouching, and crawling. Mentally, the claimant is capable of performing simple, repetitive tasks and instructions.
6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7.     The claimant was born on June 16, 1972 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).
8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).
11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 16, 2009, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 16–21.

II.    Discussion

Plaintiff alleges the Commissioner erred in discrediting the opinions of the examining medical professionals based on her theory that Plaintiff lacked credibility. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ rejected evidence from medical professionals because she considered Plaintiff to lack credibility. [ECF No. 10 at 6]. She contends the ALJ impermissibly substituted her lay opinion for the medical opinions in the record. *Id.* Plaintiff maintains that none of the medical professionals who examined her indicated she was malingering or embellishing her symptoms. *Id.*

The Commissioner argues that Dr. Barnes, Dr. Tollison, Dr. Moody, and Dr. Chipman were not treating physicians and their opinions were not entitled to controlling weight. [ECF No. 11 at 9]. She contends the ALJ gave great weight to Dr. Barnes' opinion and did not disregard it. *Id.* She maintains that the ALJ gave "some weight" to Dr. Moody's opinion by limiting Plaintiff to simple and repetitive tasks. *Id.* She argues the ALJ also gave "some weight" to Dr. Tollison's opinion in limiting Plaintiff to jobs involving simple, repetitive tasks and instructions. *Id.* at 10. Finally, the Commissioner

maintains that the Appeals Council was not required to review Dr. Chipman's report because it concerned a period after the ALJ's decision. *Id.*

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be assigned to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. § 404.1527(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

The ALJ gave "great weight" to Dr. Barnes' findings as "they accurately reflect the claimant's physical condition." Tr. at 18. She explained that she conferred "little weight" to Dr. Norris' opinion because her records did not reflect any of the limitations she specified and "mainly discuss medications for depression/anxiety with essentially normal physical exams." Tr. at 19. She gave "some weight" to Dr. Moody's finding of

impaired concentration, but found "that limiting the claimant to simple tasks would accommodate her concentration deficits." *Id.* She accorded some weight to Dr. Tollison's assessment, but disagreed "with Dr. Tollison's opinion that the claimant does not exhibit the concentration, persistence, and pace typically required in a work setting" and did "not find this conclusion to be supported by the longitudinal record." *Id.* She also did "not agree that chronic fatigue would require frequent, unscheduled breaks, as the records do not reflect chronic fatigue and the claimant is considered to be cancer free with no significant residual effects from chemotherapy." *Id.* The ALJ indicated "the record does not support a finding of cognitive problems which would preclude all work" and that "Dr. Tollison examined the claimant on only one occasion at the request of the claimant's attorney." *Id.*

Plaintiff urges this court to look to the Tenth Circuit's decision in *Sisco v. U.S. Dept. of Health and Human Services*, 10 F.3d 739, 744 (10th Cir. 1993). In *Sisco*, the ALJ declined to recognize chronic fatigue syndrome as a medically-acceptable diagnosis because it could not be diagnosed in a laboratory setting. *Id.* In holding that Section 223(d)(5)(A) of the Social Security Act required only that a diagnosis be made according to the "technique presently used and accepted by the medical community," the court explained that the ALJ "cannot substitute his lay opinion for that of Congress, the Mayo Clinic, Plaintiff's doctor, and the entire medical community." *Id.*, citing *Reed v. Secretary of Health and Human Services*, 804 F.Supp. 914, 919 (E.D. Mich. 1992). This court was previously persuaded by the Tenth Circuit's holding in *Sisco* in *Browning v. Astrue*, C/A No. 8:09-1793-PMD-BHH, 2010 WL 3730172, *13 (D.S.C. July 30, 2010). The court

held that the ALJ neglected to sufficiently support his decision to disregard the examining medical source's opinion because he did not show how the opinion was based on the plaintiff's subjective complaints. *Id.*

Although the ALJ did not specifically articulate that she was rejecting the medical opinions in the record because she found them to be based on Plaintiff's subjective complaints, a review of the decision as a whole suggests the ALJ disregarded relevant medical opinions because she considered them to be based on evidence she did not consider to be medically-acceptable. The ALJ assessed Plaintiff's credibility as follows:

> I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible and would not preclude light work as described above. I do not suggest that the claimant does not experience some limitations due to her impairments. However, the limitations alleged by the claimant that find support within the objective medical record have been accommodated for by the above residual functional capacity assessment.

Tr. at 19. Thus, the ALJ disregarded many of Plaintiff's alleged symptoms and limitations because she determined they were not supported by the objective medical record. However, in determining the contents of the objective medical record, the ALJ neglected medically-acceptable observations and diagnostic techniques that supported the opinion evidence in the record.

The ALJ erred in failing to use the framework set forth in 20 C.F.R. § 404.1527(c) to consider and weigh Dr. Tollison's opinion. She essentially addressed the consistency factor in concluding that the opinion was not supported by the longitudinal record and the treatment relationship factor in pointing out that Dr. Tollison conducted a one-time

evaluation at the direction of Plaintiff's attorney. *See* Tr. at 19. However, she neglected evidence that was consistent with Dr. Tollison's opinion. The ALJ failed to recognize the similar functional limitations identified by Dr. Tollison and Plaintiff's treating physician Dr. Norris, who suggested Plaintiff had a limited ability to stay on task and would require frequent breaks. *Compare* Tr. at 386, *with* Tr. at 400. She also failed to acknowledge observations from Dr. Barnes and Dr. Moody that were consistent with Dr. Tollison's observations, test results, and opinion. *See* Tr. at 318 (Dr. Moody observed that Plaintiff's concentration was impaired and that she became very emotional, broke down, cried, and was anxious throughout the examination), 323 (Dr. Barnes observed Plaintiff to be depressed and anxious and to cry several times during the examination). The ALJ also neglected the supportability factor by ignoring the objective test results obtained by Dr. Tollison that supported his conclusion. *See* Tr. at 384–85. Dr. Tollison based his conclusions on his personal observations and the results of two recognized psychological tests[4] that he deemed valid. *See id.* In light of the ALJ's failure to address the supportability factor and her inadequate examination of the consistency factor, the undersigned recommends a finding that her decision to disregard Dr. Tollison's conclusions regarding Plaintiff's functional limitations was not supported by substantial evidence.

Furthermore, the undersigned recommends the court find that the ALJ did not adequately address the functional limitations supported in the record by restricting

---

[4] The ALJ did not specifically address the test results Dr. Tollison obtained, so it is unclear whether she rejected Dr. Tollison's opinion because she believed the testing methods were inconsistent with medically-acceptable clinical diagnostic techniques.

Plaintiff to simple, repetitive tasks and instructions. Dr. Tollison indicated Plaintiff would have problems learning, remembering, and carrying out instructions repetitively, which directly conflicts with the limitations set forth by the ALJ. Tr. at 386. The ALJ also neglected to address further restrictions advanced by Dr. Tollison, including a need for frequent and unscheduled rest periods; problems responding appropriately to changes in the workplace; and difficulty coping with routine work pressures, stresses, and demand situations. *See id.* Because the ALJ did not address all the restrictions advanced in the record, the undersigned recommends the court find that she did not adequately consider the opinion evidence in assessing Plaintiff's RFC.

In light of the undersigned's recommendation that the claim be remanded, it is unnecessary to address whether the Appeals Council erred in declining to remand the claim for consideration of Dr. Chipman's opinion. The ALJ should consider the entire body of evidence upon remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

June 18, 2015                          Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).